This is a test case for the day, which is Joanna Masher v. Comm Soc Sec. This is Michael Astru. Good morning and may it please the Court. My name is Wilbur Seitzinger. I represent the plaintiff in this case, Joanna Masher. If you would pick the microphone up a little bit so we can hear you better. Is that better? That's great. Thank you. Can you hear, judge-wise? Yes, very well. I represent the plaintiff, Joanna Masher, and I would like to reserve two minutes for rebuttal. All right. Thank you. The standard of review in disability cases is whether or not there is substantial evidence in the record as a whole to support the decision that was made below. And that evidence must be sufficient to support the conclusion of a reasonable person, considering the record as a whole and not just the evidence that was in support of it. Is your main point that Dr. Togut was the treating physician, had been the treating physician before and after the onset of disability, and that the Mandel only looked at her once and technically it was before the onset of disability? Not exactly. He did not get involved until just the onset of disability. He saw her in August of 2004, Dr. Togut, for the first time, after she had had her surgery in 2003 on the carpal tunnel. But you are correct, judge. He was the main treating physician. He saw her approximately 12 times over the course of a two-and-a-half-year period, and Dr. Mandel saw her on only one occasion. And that was before the onset or the alleged onset of disability? It was in May, correct, and August was the onset. August was the onset, correct. So he saw her just around that time after she had had her carpal tunnel surgery. Dr. DiGiovanni, the neurologist who suspected that condition, referred her to Togut because Dr. Togut is a thoracic outlet syndrome specialist, limits his practice to that malady, and he saw her in connection with those problems. Now the ALJ had said that what happened here was that Dr. Togut was relying to the ALJ's view on the subjective complaints of Ms. Masher. And what would be your argument that that's not the case, that he's actually relying on testing and significantly more than subjective complaints? I think he's doing both, in all honesty and candor. But I really think what Dr. Togut did was to, number one, look at the EMG studies, which showed evidence of nerve damage at the wrist, both sides, bilaterally, also at the right elbow, and also at the right... His specialty was, he was a thoracic person, wasn't he? Thoracic outlet syndrome is his specialty. He confines his practice... But he was more specialized than the other two in terms of what he dealt with as his specialty. Arguably, I would say yes. Dr. Mandel was a neurologist, a general neurologist, seeing all kinds of neurological conditions. Dr. Togut limits his practice specifically to thoracic outlet syndrome. That may have been why the administration chose him as their own examiner in the case, because they had him look at her for purposes of giving the agency... But does thoracic outlet syndrome affect the wrist? The carpal tunnel affects the wrist, but the thoracic outlet syndrome can also affect the wrist as well. It can be involved in three areas. It can be involved in irritation coming out of the brachial plexus, which could result in symptomology at the wrist, which she had by way of carpal tunnel, also symptomology that she had in the right elbow, and also symptomology that she had obviously coming out of the neck and the shoulder. So all three would be implicated in thoracic outlet syndrome, Your Honor. So to answer your question directly, he was, I would say, the better credentialed expert here and did see her over the course of 12 visits. And to get back to your question about the subjective complaints, I think the Eberhardt case kind of answers that. You have to allow the doctor to use his expertise in looking at a patient's condition to assess, is this person a malingerer, is this patient a symptom magnifier, do her complaints relate to what I'm finding both in terms of the EMG and in terms of my palpation on nerves, all those things. He did physical exam, he did range of motion, nerve tension tests, sensory assessment, tuning fork, tests for deep tendon reflexes, sensory testing, muscle strength, elevated arm stress test. I mean, he did a lot of testing, correct? I would say so, yes. I think the extent of the judge below, the ALJ said that he did not. I don't know quite frankly where that comes from because he had the diagnostic testing in the form of EMG and then he had what we call the provocative or clinical testing that the doctor will do on physical examination of the plaintiff or the patient. In each of those occasions, he was able to reproduce those symptoms, which for him confirmed that she, number one, had these problems and number two, were symptomatic in giving her problems. With respect, Judge Amber, to your question about subjectivity as well, the treating doctor, I think, knows the patient much better than Dr. Mandel did. Dr. Mandel just authored a report and said, I've examined her, she does have this condition but she can go back and do some kind of sedentary work. Dr. Togut knows her a lot better. The problem you have in Social Security, unlike workman's comp here, is that you have an extra step in Social Security. Okay, assume for the moment that the person at step four cannot do the job that she was previously doing, are there other jobs with her restrictions in the community or community writ large can she do? And that's what was found here. How do you overcome that step five analysis? I would say a few things about that, Your Honor. Number one, she tried the second return to work attempt to go back to modified work in an office setting. She got in trouble at Sears doing the conveyor belt and the repetitive work. But her second return to work was in an office setting where she did some copying, a little bit of computer work, a little bit of filing. Those are certainly lighter positions, lighter work. And she failed at that after only a two-month try. She lasted two months. She worked eight hours. It was too much. She cut it back to six. That was too much. Again, that's really step four. All right. And then we get to the VE, which basically identified three jobs. They identified the job of packer, sorter, and I believe visual inspector. Visual inspector. The vocational expert testified that those jobs required the use of hands, plural, hands, for gross manipulation. So arguably the – How does the visual inspector require that? You have to not only look at things, but if there's a problem with those items, you're going to have to do something with them, take it off the conveyor belt, put it away, somehow flag it as being defective, pass it as being okay. So it involves use of the hands. Had they used – excuse me. Had they used Togut's conclusions and diagnosis and incorporated them into the hypothetical for the vocational expert, would the result have changed? I think it would have had to ipso facto because his conclusion, Dr. Togut's conclusion, was that because she is so symptomatic, even with regard to activities of daily living, and can't really get through her own day around the house without significant problems, she would certainly fail if placed back into the work setting, even in a modified position, even at a sedentary job. So I think had that been given, perhaps, there may have been a different outcome with respect to what the VE might have said. Togut kept saying that she was disabled. And somehow I sense that maybe the ALJ wasn't, you know, wasn't pleased with that domain being taken over by the doctor. Thinking that it was conclusory. In fact, that's what she said. Yeah. He may have stepped on her toes, I think, and I would concede that perhaps that was somewhat going on psychologically in terms of how we are as people and how we react to things. But I think that what perhaps should have been done was if the judge would have gotten beyond what he was saying in terms of that conclusion that he used as disabled and looked really to what he had to say about what he knew of her from seeing her all those times over two and a half years, she could have recognized that he was the doctor who knew her much better than the one-time examiner, Dr. Mandel, and could have perhaps gotten beyond the fact that he chose to label it disabled or as a conclusory label. The other thing the ALJ does is devotes one, really I think one line to her. She testifies she doesn't have any problem walking, sitting, or standing. She does have limited reaching with her right arm. Well, there's a lot more in the record about her inability slash disability, is there not? That's true. I think that the problem that the ALJ had, or at least for me in my review, is that when you say that TOS affects only reaching, pushing, and pulling, it doesn't really give you the whole constellation of what's wrong with this person. If you look at what Dr. Togut talked about with his patient over those times where he found that she doesn't put makeup on because it's too hard to apply it. It's too painful to put makeup on her face. She can't brush her hair. She wears sweatshirts so she has pockets to put her hands in for arm support. She's dropping her keys. She's dropping her cell phone. Her hand gets cold. It sweats. It swells. All of these things that he's seen over a long period of time really show that she's not only disabled in the workplace but basically has very severe limitations even with respect to daily living activities. Mr. Sizinger. Yes, Your Honor. May I get back to the point that Judge Ambrose was making? Step five. I suppose we all know of people who had an arm amputated and are still able to hold down some kind of a job. Assuming that Ms. Masher cannot use her right arm, is it your contention that the pain she suffers is the factor that prevents her from working? That's correct, Judge. I think with an amputation, what you have, unless you have some kind of an aroma or phantom limb pain, if you lose a limb, that limb, although it's out of the way, is not going to give you any difficulty. So you can do certain jobs perhaps. It will certainly give you a lot of difficulty in everyday living. That's true. You would have some difficulty, but your point is correct, Judge. My position is that the pain that she would have would preclude her ability to do that work, even though it is involving the right arm. In addition to that, the point I want to make as well is that there was some evidence by Dr. Togut at page 167 of the record in which he said that she was beginning to develop the TOS symptoms on the left side as well. Her left arm was also becoming involved, and that's due to the fact that you basically are overusing the left arm because your right arm is of no practical use to you in day-to-day activity. So it's really a bilateral problem that she had, the right being greater than the left, of course. But with respect to an amputation, I think it's somewhat different because of the pain level you're on. The ALJ on pages 12 and 13 of her opinion said that she accepts that there's a right-side disability, but she does not accept that there's a left-side disability, and she refers to Exhibit 3F. What is that all about? Bear with me, Your Honor. And if you don't have it in front of you, maybe you can deal with it on rebuttal. But what is Exhibit 3F? What page is that? 12 and 13. It's 19 and 20, I guess, of the appendix. 12 and 13 of the opinion. Well, it says 6 of 9. Yeah, 6 of 9. I'm sorry. I'm looking at the bottom. It says 12. Can I reserve that for rebuttal, Your Honor? That would be fine. I can't find it now. I have a minute left. It's 6 of 9 and 7 of 9 where she mentions it. So getting back to my point, I think it's clear that what happened below was that the treating position rule was violated by the judge and by the lower court in that they should have given much greater weight to Dr. Togut than to Dr. Mandel. And because they did not. Who gets the offset here, workers' comp or Social Security? In Pennsylvania, what will happen in Pennsylvania, Judge, is that the workers' compensation carrier, their benefits are paid in full, and then Social Security gets the offset. So to the extent that Ms. Masher receives workers' compensation, the government, Social Security, will get credit for that in the event that she is determined to be successful. And if she does not get Social Security benefits at this point, and five years down the road, her workers' compensation benefits are terminated, she's out in the cold? She may very well be, because her insured status for disability extends only approximately five years beyond the date she last worked. She last worked sometime, I believe, in 2004, so her insured status for disability is going to expire probably sometime in 2009. So this is really her only chance at benefits at this point, based upon her earnings record currently, Your Honor. Now, if her condition improves, or maybe she has surgery or decides to go ahead with surgery later on, will she still get Social Security benefits if her condition is much better than it is today? She would lose those benefits if the administration would be able to show an improvement in her condition. So if there's an award given, they could monitor her condition and they could bring her back for a review, at which time they would look at whatever else may have happened to her, and if they can show an improvement, such as she can work, then there would be a cessation of the disability benefits, Your Honor. Correct? Thank you. I believe my time is up. All right. We'll have you on rebuttal. Thank you. Thank you. Good morning. My name is Anne Von Schaven, and I represent the Commissioner of Social Security. I'd like to make just some opening remarks about the case and then turn to the treating physician's opinion, Dr. Togut's opinion, and your concerns about that. This case involves a very young woman. She was only 28 years old when she alleged that she became disabled. Her claim, as has been noted, arises in the context of a worker's compensation claim. She was awarded benefits for her inability to do the job that she did, removing, essentially unjamming or removing boxes on a conveyor belt. And that job required a very... We're familiar with the facts. Yes. But the standard for disability here under the Social Security program is, of course, different, and she needs to show that she's unable to perform any other work. We understand that. But the question, when you look at the ALJ's opinion, it runs through up until page 6 of 9. And as a very matter of fact, and all of a sudden it says, the undersigned administrative law judge is unable to give Dr. Togut's opinion significant weight for a number of reasons. First, this is merely a conclusory finding apparently based on the claimant's subjective complaints. Secondly, the opinion on the ultimate issue of disability is reserved for the commissioner. Third, Togut's opinion is not supported by objective medical evidence or record. The second looks like she's just upset. The first is, it wasn't merely a conclusory finding based solely on subjective complaints. There were a lot of testing done, which ties in with the third. And she then goes on and says, Dr. Togut's diagnosis was essentially the same as Mandel's, and he did not indicate that the claimant was totally disabled. Accordingly, the undersigned administrative law judge cannot accord any significant weight to Dr. Togut's opinion as far as total disability, etc. That doesn't make any sense. That's completely illogical. Let me try to help and explain. I think what the judge has before her, of course, are these two opinions, Dr. Togut and Dr. Mandel. They both have examined her. They both are specialists in different areas. They both have pieces of their opinion that's supported by objective medical findings. So to the extent that Dr. Mandel... They basically agree, and she says, Togut's diagnosis was essentially the same as Mandel's, and he, Mandel, did not indicate that the claimant was totally disabled. Mandel looked at her in May, and her onset of disability alleged is August. I mean, how do you take Mandel over Togut in that type of situation? And it gets worse. We'll go on further. Well, I think that to the extent that they both have... To the extent that both doctors conclude that she has functional limitations in her hand and in her arm, the ALJ credits that piece of the opinion because that's supported by the objective medical findings, the EMG, and the testing of her thoracic outlet. To the extent that Dr. Togut says that she's totally disabled, of course, under the regulations, that's what's called a conclusory finding. She can just ignore it. She can ignore that part of it. It's up to her to make the finding whether he's totally disabled or she is totally disabled. But the point is, what's said here is you've got two people coming to the same diagnosis, and Mandel, who looked at her one time before the onset of alleged disability, didn't indicate that she was totally disabled. Accordingly, I'm going to find that she's not disabled. And then where it gets worse is I accept Dr. Mandel's opinion, but limit the restrictions to the right side only. What gives her the right to do that? She can't do that. Yeah, because Mandel says, subsequent complaints led, in my opinion, led to left upper stream extremity findings. And Mandel also says full duty is doubtful at present and in the foreseeable future. If there's a question on her part, or she's incapable of performing those activities, then one could consider a functional capacity evaluation. I mean, I don't think Mandel gets her home free. I mean, gets her back to work either. Well, I think there are several issues, several questions raised.  Well, go back to Judge Ambrose's question. How can she unilaterally say, I discount any finding that there's a problem on the left side? Ultimately, the jobs, based on the VE's testimony, actually don't require overhead reaching, pushing or pulling, or fine manipulation. So that's going to cover both arms. So, for instance, a job such as a visual inspector, in which you're, say, observing a product moving down a conveyor belt and removing a defective product, is essentially a visual job. I think that's the clearest job. Well, but if you're removing and you have to manipulate something, you know, maybe you're seeing if a moving part is there, or maybe it's a set of keys and she drops keys. I mean, I don't know. It just seems to me she's taking some things out of the equation when she asks the vocational expert what, you know, what this person's capable of. Well, I think she's concluded, based on the functional limitations that the ALJ includes in the RFC and in the hypothetical question, are overhead reaching because that's what's exacerbated by thoracic outlet syndrome, pushing and pulling because that also affects her arm and that's related to her thoracic outlet syndrome, and what she calls sensation or, excuse me, feeling, which is the sensation resulting from carpal tunnel. So she can't do fine manipulation, but she can do gross manipulation. So, for instance, picking up keys is a gross manipulation. Fine motor would be buttoning a button or turning a screw. So these jobs aren't going to require fine manipulation. But returning to how the ALJ weighed these opinions, she gave three reasons and they seem to refer to different aspects of the opinion. Just to give you an example, my problem is when I read through this, it doesn't make sense. Just returning to the right side, left side, she accepts Mandel's opinion but limits the restrictions to the right side only, which is in conformity with medical records since she cites to Exhibit 3F, which I asked her opposing counsel about. Then she says in December 2003, Dr. Giovanni opines that, she switches gears. She says, Dr. Giovanni opines that the claimant is capable of light, non-repetitive work. I don't know why that sentence is in there. Then the next sentence, the medical evidence supports a reduction to sedentary work. I don't know why that sentence is in there. Now she goes back and says, I reject all of Dr. Togut's opinions from 2004 to 2007. Completely conclusory statement. All medical examination findings show limitation of the right arm. There are no objective findings that show any deficit to claimant's left arm beyond the 2003 finding, etc. Now she's back to the left-right. How can she reject all of Togut's opinions for three years when he's looked at her after the onset 12 times, or up to 12 times, and he is saying there's clearly a going from the right side to the left side over the course of time? Well, the decision as it's written may be not well organized, but let me try to help with what I think the ALJ is doing here. So the ALJ is presented with these opinions, and to the extent the ALJ is looking for evidence of functional limitations, because, of course, this disability program is based on what you are still able to do, what your functioning is. And the ALJ is crediting that portion of Dr. Togut's opinions, which refer to her arm and her hand, which are supported by objective medical findings, all of the EMG and all of the tests. Indeed, both of these doctors agree that she has limitations in her upper extremity. To the extent that Dr. Togut's opinion is that she is, quote, unquote, disabled, and we've discussed this, of course, that is reserved to the commissioner. And then the leftover piece of his opinion is that she can't do sedentary work. So as I understand what the ALJ is saying is the piece of the opinion that's not supported by objective medical findings is the extent to which Dr. Togut says she can't even do sedentary work because there isn't evidence of impairments in any other body part that would limit her, for instance, from sitting or standing or walking. She says she can walk a mile. He's reduced her considerably to sedentary work. But what does Mandel mean when he says she can return to modified duty as of the date of my report? Full duty is doubtful at present and in the foreseeable future. Restrictions and limitations are as indicated. I mean, full duty. Both Dr. Togut and Dr. Mandel evaluated her in the context of her workers' compensation claim. And some of the language in those reports, just because of where they originated, refer to that's a workers' comp concept that she can't return to her job that she was doing, which was heavy. And he says at a certain point she could return to light with no lifting. Is this opinion probative of her condition in August? His opinion is three months before her onset date. Am I correct? Three months before her onset date. And, of course, the reason is that she has a workers' comp claim first. But, I mean, I don't care about the reason. I mean, logically. So she comes before the agency with her history and her medical evidence. The agency considers that evidence, also sends her to a consult. Of course, she chooses her treating doctor because under the regulations we prefer to do that. And so the evidence that the ALJ looks at evidence technically before her onset, and I would suggest that it's close enough and that it is that there's no evidence that her condition has changed so much in those three months. I would suggest that the condition had worsened, including there was an evaluation done in February of 2005, and there were other indications in other visits that her condition was worsening. In addition, Mandel's report states that if Masher is incapable of performing the activities on his work capabilities form, then perhaps a functional capacity evaluation should be done. And was that ever done? Functional capacity evaluation? Mandel does it. Mandel said that if she's unable to perform some of the things that, if she becomes unable to perform some of the things on the work capabilities form that I have here, then a functional capacity evaluation should be considered. Dr. Togut references a functional capacity evaluation, but we don't have that report itself in the record. But she has testimony in there. But if Togut's referencing it and Mandel's saying maybe we ought to consider it, maybe it was done, and Togut is saying that she's disabled, why shouldn't we give the call here to Dr. Togut? Because his, to the extent that he finds that she has functional limitations, the ALJ includes those and very specifically restricts her. But the evidence as a whole doesn't show that she's unable to perform this very limited range of sedentary work. Dr. Togut even says that when he does the consult that her condition has plateaued, that her pain is now at a three. His progress notes at the end of the record at about 180 or 90 show she's doing better. She's doing better. Her pain is at a three. Even she says that her medication controls her shoulder pain. She has some numbness, but it's not constant. I mean, this is not to say that she doesn't have limitations or that she doesn't have some pain and some discomfort. But the question is, is it to the extent that she's so unable to do so many functional things that she can't do any work? Step five, it's still full time, correct? It's still full time. And wasn't that when she went back to work, attempted to go back to work, didn't she have a problem working full time? Initially she went to her... And this is before the condition got worse, according to Dr. Togut. Yeah, initially she... Both of those jobs are different from the one that the ALJ concluded that she could do based on VE testimony. So the first time she did go back to her job on the conveyor belt, there's some testimony that she didn't have lifting, but she had other movements of her arm. She did an office job, which was typing. That's fine motor. That's aggravated her carpal tunnel. But the ALJ found she could do work that wouldn't require her to do those specific movements. I mean, I think really accommodated the limitations she had based on the evidence. Where is the hypothetical in the record? Do you have it? In the ALJ's? To the VE. The VE? Because Togut definitely says the left side is implicated as well, and it's getting bad. I just wondered if this is in here. I believe it's at about 2. Yeah. With respect to the left side, the ALJ does say, the ALJ considers it and says there really is more evidence on the right than the left. And if you go through the record, there are findings on the right, very few findings on the left. But to the extent that there is some evidence that she has some carpal tunnel in the left, greater in the right, but in the left. There's no pain over the top of 2.8. I'm sorry, were you finishing? You can go ahead. To the extent that she has some limitations and some that she now has thoracic outlet in the left, the VE testified these jobs don't require essentially bilateral. So it's the overhead lifting that's going to aggravate her thoracic outlet. It's the pushing and pulling that's going to aggravate thoracic outlet. It's the fine motor that's going to aggravate her carpal tunnel. But the jobs don't require that. So would it have been clearer had the ALJ found on the left? Perhaps. But the evidence actually shows that it's less on the left. I mean, she uses it. The description given at the top of 2.18 to the vocational expert is very sketchy. It has lifting. It says no limitations to standing, sitting, walking, occasional climbing and balancing, but never on ladders. There would be a right upper extremity overhead reach limitation and a right upper extremity feeling limitation. There would be a need to avoid temperature extremes. Could such an individual perform past relevant work? No. Could perform any job? Yes. I mean, I'm just thinking the hypothetical really doesn't do it either. And I think the – I see I'm out of time. You may finish. You may sum up. And I think the vocational expert's testimony explains that, that their jobs don't involve pushing and pulling and that they don't involve fine manipulation. And so the commissioner believes that there is overall substantial evidence that Ms. Masher can still do a very limited range of sedentary work. Thank you. Thank you. Thank you. Judge, you had a question about 3F. Yes, sir. 3F is Dr. Mandel's report. Did you have a specific question about that? No. All right. With respect to what counsel said, a little bit of clarification, counsel mentions that her pain level was at a 3. The pain level at a 3 is when she's home basically doing nothing and not doing really anything. Whenever she does more activity, she gets into trouble, and that causes the pain level to rise to a much higher level. She's taking gabapentin, which is a nerve medication for nerve pain specifically, and she's taking hydrocodone, which is a relatively heavy-duty pain medication. So she is medicated to this date. With respect to counsel's suggestion that the jobs found by the V.E. are somewhat maybe easier than even the modified office work that she tried to do, I would suggest to the contrary. When she went to the office setting, she was doing some filing, not very much typing, a little bit of sorting, maybe some copying. She could vary the activities in that job. But if she's doing a job as a packer or a sorter or an inspector, she's going to be at a location where she's going to be using both of her hands to do those positions. And the V.E., as I said, did say at page 220 that you need to be able to use both hands for what she termed gross manipulation in doing those jobs. So to the extent that she failed going from eight hours to six hours to four hours a day in a modified office setting, she would, I would argue, do worse if she were put into the kind of cookie-cutter factory-type jobs of sorter, inspector, and packer. It would cause her much greater difficulty than she had even trying to do the office work. I think in summary, we have a very unfortunate woman. Counsel mentions that she's young, and that's true. She is younger, but she has a pretty serious condition. Threshold syndrome is not a fun condition to have, and it's affected all aspects of her life, not just impairing her ability to continue to work, but it's, as you can see from what she's testified to and what Dr. Togut has described, she has severe limitations in her ADLs. And for that reason, I believe she's a very deserving candidate for disability benefits. And I thank you for your time. What are you asking us to do? Are you asking us just to remand? I'm asking you to reverse the decision. I believe that the evidence from Dr. Togut, as the treating source, is so overwhelmingly clear in terms of his limitations with respect to what her problems are, that it would be, I don't want to say fruitless, but I think that the conclusion should be that his testimony carries the day and supports an outright reversal with the benefits of the ADL. But if you're going to do an outright reversal, then we'd have to do it step three, say that this is, in effect, a listed impairment. And it's not, is it? It's not an actual listed impairment, and I'm not sure I can argue. I mean, where we are is step five, no matter which way you end up, right? We are at step five, correct. And we'd be crediting the doctor's conclusion as to disability, which I think is difficult for us to do. Which I think may have caused a problem to begin with. Perhaps, as Judge Rendell also alluded to, yes. Okay. All right, thank you.